UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:                                                    CHAPTER 11 CASE

URBAN OAKS BUILDERS LLC, Debtor.                          CASE NO. 18-34892
                                                          (S.D.Tex.)

_____

| | |
|---|---|
| SOUTHSTAR CAPITAL GROUP I,<br>LLC, a Florida limited liability company;<br>COTTINGTON ROAD TIC, LLC, a Delaware<br>limited liability company; and DURBAN ROAD<br>TIC, LLC, a Delaware limited liability company,<br><br>     Plaintiffs,<br><br>v.<br>1662 MULTIFAMILY LLC, a Delaware limited<br>liability company; HINES 1662 MULTIFAMILY, LLC,<br>a Delaware limited liability company; HINES<br>INVESTMENT MANAGEMENT HOLDINGS LIMITED<br>PARTNERSHIP, a Texas limited partnership;<br>HIMH GP, LLC, a Delaware limited liability company;<br>HINES REAL ESTATE HOLDINGS LIMITED<br>PARTNERSHIP, a Texas limited partnership; HINES<br>INTEREST LIMITED PARTNERSHIP, a Texas<br>Limited Partnership; JCH INVESTMENTS, INC.,<br>a Texas corporation; and URBAN OAKS BUILDERS<br>LLC, a Delaware limited liability company,<br><br>     Defendants. | Miscellaneous Proceeding<br>6:19-mp-00001-KSJ |

## MOTION FOR LEAVE TO APPEAL

Plaintiffs Southstar Capital Group I, LLC, Cottington Road TIC, LLC, and Durban Road

TIC, LLC ("**Plaintiffs**") hereby move pursuant to 28 U.S.C. § 158(a)(3) and Rule 8004 of the

Federal Rules of Bankruptcy Procedure for leave to appeal, in the alternative to the direct appeal

filed herewith, from the Bankruptcy Court's Order Granting Motion to Transfer and Denying Motion for Remand (the "**Order**") (**Exhibit A** hereto) to the extent that it denied Plaintiffs' Dispositive Motion to Abstain and Remand, and further to the extent that it granted Debtor Urban Oaks Builders LLC's ("**UOB**") Motion to Transfer Venue.

Leave to appeal should be granted because the Order implicates important and controlling jurisdictional questions as to whether the Bankruptcy Court, respectfully, (a) impermissibly transferred Plaintiffs' state court action (the "**State Court Action**"), which was originally filed in the Ninth Judicial Circuit in and for Osceola County, Florida and thereafter removed to the District Court by UOB, to the United States Bankruptcy Court for the Southern District of Texas (the "**Texas Bankruptcy Court**"), in contravention of the mandatory abstention doctrine; and (b) erred in denying Plaintiffs' motion to remand and/or abstain from hearing the State Court Action in accordance with the permissive abstention and remand doctrines. In denying Plaintiffs' motion to remand or abstain from hearing the State Court Action, and granting UOB's motion to transfer the State Court Action to the Texas Bankruptcy Court, the Bankruptcy Court, respectfully, violated the mandatory and permissive abstention statutes. As a result, this appeal will present important threshold issues as to the correct venue of the State Court Action. There is substantial authority supporting the application of both mandatory and permissive abstention in this case, as well as the retention of the State Court Action in this district in the event it is ultimately concluded that abstention is not appropriate here. Therefore, there is substantial ground for difference of opinion regarding the jurisdiction and venue issues here, and resolution of these issues will materially advance the case. Accordingly, leave to appeal the Order should be granted.

## SUMMARY OF THE CASE

### A.       Factual Background

The disputes in the State Court Action arise from Plaintiffs' purchase of the Property (defined below) on or about July 1, 2016 for $67,000,000.00.  Plaintiff Southstar Capital Group I, LLC ("**Southstar**"), as manager and agent for Plaintiffs Cottington Road TIC, LLC ("**Cottington**") and Durban Road TIC, LLC ("**Durban Road**"), entered into that certain Agreement of Sale and Purchase between Southstar and 1662 Multifamily LLC ("**1662 Multifamily**") (the "**Agreement**").  Cottington and Durban Road are "permitted assigns" of Southstar, as that phrase is used in the Agreement.

In the State Court Action, Plaintiffs allege that the defendants, each of which are affiliates of Hines Interests LP (collectively, the "**Hines Entities**"),[1] intentionally withheld, actively concealed, misrepresented and/or fraudulently failed to disclose physical characteristics and existing conditions of the 306-unit multifamily project that they sold to Plaintiffs located at 1662 Celebration Blvd., Celebration, Florida 34747 (the "**Property**").  Defendant UOB served as the licensed general contractor for work on the Property pursuant to Florida Statute Section 489.119.  Defendant 1662 Multifamily, a non-debtor affiliate, sold the Property to Plaintiffs.  Plaintiffs assert that the remaining Hines Entities dominated and controlled UOB and 1662 Multifamily, such that the Hines Entities are alter egos of each other.

After Plaintiffs purchased the Property, Plaintiffs discovered that the Hines Entities intentionally withheld, concealed and failed to disclose extensive non-compliance with the as-

---

[1] As the District Court recounted in its Order to Show Cause in the Coverage Action (defined below) [D.E. #53], the Hines Entities are related entities with overlapping or common ownership and management involving Jeffrey C. Hines and Gerald D. Hines.  According to its website, Hines possesses over $66 billion in assets under management in the United States.  *See* https://www.hines.com/locations/usa.

built drawings, and extensive violations of the Florida Building Code, as well as other latent defect conditions, which could not be observed or determined by Plaintiffs through the exercise of ordinary reasonable diligence (collectively, the "**Hidden Defects**").[2]  The nature and extent of the Hidden Defects were discovered only after components in each of the six buildings began to fail as a direct result of several of the Hidden Defects.  After the entire Property was evacuated, it was necessary to carefully and methodically rip and tear apart substantial portions of the buildings to investigate the full extent and nature of the Hidden Defects.  The Hidden Defects resulted in the Osceola County Building Department issuing an Order dated August 14, 2017, condemning the Property.  Consequently, the Osceola County Building Department posted a Notice of Evacuation on all six buildings on the same date.

Plaintiffs have estimated the cost of the repairs required due to the defective work and the resulting damages (including lost rent) at more than $45,000,000.00, which damages continue to escalate, including at over $451,000.00 each month for the lost rent claim alone.

Plaintiffs brought the following state-law causes of action against the Hines Entities in the State Court Action: (i) fraudulent non-disclosure/fraudulent inducement (Count I); (ii) breach of contract and/or the covenant of good faith and fair dealing arising thereunder – intentionally withholding of material information (Count II); statutory violation of Section 553.84, Florida Statutes (2001) (Violation of Florida Building Code Statute) (Count III); negligence (Count IV); rescission (Count V); and breach of warranty agreement (Count VI).  Plaintiffs demanded a jury trial.

---

[2] The Hidden Defects include without limitation defective construction of the structural elements; Building Code Violations; defective construction of the shear walls; failed tension rods; improper construction of structural members; improper installation of structural Zip Board sheathing as part of the building envelope; failed cantilevered balconies, balcony railings and roof elements; and improper water proofing and flashing at balconies.

## B.  Procedural History

Plaintiffs commenced the State Court Action on February 15, 2018.  On May 18, 2018, Defendant UOB filed an answer and affirmative defenses and also a motion to dismiss the complaint.  On May 18, 2018, the remaining Hines Entities filed a motion to dismiss the complaint.[3]  On August 31, 2018, Plaintiffs filed a motion for leave to file an amended complaint.  These motions were pending before the State Court at the time UOB removed the State Court Action to the Bankruptcy Court.  Additionally, Plaintiffs propounded discovery on the Hines Entities prior to the removal of the State Court Action.  On June 8, 2018, UOB sought an extension of time to respond to written discovery, and on July 23, 2018, UOB filed a second motion for extension.  A hearing on UOB's second motion for extension of time to respond to discovery was scheduled for September 6, 2018.

On September 4, 2018, UOB filed its suggestion of bankruptcy in the State Court Action, declaring that the entire State Court Action is stayed.  UOB had filed a voluntary Chapter 11 petition in the Bankruptcy Court, Case No. 18-34892 on August 31, 2018.  UOB commenced its Chapter 11 case with the stated goal of transferring the State Court Action and the Coverage Action to the Bankruptcy Court.[4]

---

[3]On June 7, 2018, the Hines Entities also commenced an action in the State Court styled *Hines Interests Limited Partnership, et al. v. Southstar Capital Group I, LLC, et al.*, Case No. 2018 CA 001845 OC (the "**Coverage Action**"), seeking declaratory relief that its insurers are obligated to defend the Hines Entities in the State Court Action.  On July 17, 2018, Gemini Insurance Company filed a notice of removal of the Coverage Action to the United States District Court for the Middle District of Florida, Case No. 6:18-cv-01147-ACC-DCI.  The District Court found that it lacked subject matter jurisdiction over the coverage dispute and remanded the Coverage Action to the State Court.  Thereafter, UOB sought to voluntarily dismiss the Coverage Action, which the State Court granted.  UOB then refiled the Coverage Action as an adversary proceeding before the Texas Bankruptcy Court. Responsive pleadings to the Coverage Action complaint were due on or before May 20, 2019.

[4]*See Declaration of Todd Hagood* ("**Hagood Decl.**", a true and correct copy of which is attached hereto as **Exhibit B**) at ¶ 42. Mr. Hagood's declaration was admitted into evidence in support of UOB's "first-day motions" at a hearing before the Bankruptcy Court on September 6, 2018.

UOB appears to be a pass-through entity for the Hines Entities with little to no assets or liabilities. UOB states that its business operations are profitable.[5] The Bankruptcy Court has allowed UOB to continue to develop its three ongoing projects and pay its subcontractors and vendors.[6] UOB did not file a bankruptcy petition to obtain a breathing spell from litigation. Rather, as UOB is profitable and possesses substantial funds to litigate, UOB unabashedly seeks to "use [the bankruptcy] forum as venue from which to seek to liquidate Southstar's claims and obtain the full benefit of its insurance coverage."[7]

On September 6, 2018, UOB removed the State Court Action to the United States District Court for the Middle District of Florida, and the case was referred to the Bankruptcy Court for this district. On September 10, 2019, Defendants filed a Motion to Transfer Venue to the Bankruptcy Court for the Southern District of Texas. On September 20, 2018, Plaintiffs filed their Dispositive Motion to Abstain and Remand. On May 7, 2019, the Bankruptcy Court entered the Order Granting Motion to Transfer and Denying Motion for Remand. This Motion seeks leave to appeal that Order.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Standard for Leave to Appeal

Under 28 U.S.C. § 158(a)(3), district courts have discretionary jurisdiction to hear appeals from interlocutory orders and decrees of bankruptcy judges. 28 U.S.C. § 158(a). In determining when to exercise this discretionary authority, the district court applies the standards that govern interlocutory appeals from the district court to the court of appeals pursuant to 28

---

[5] *Id.* at ¶ 17.
[6] *See* Order Regarding Funds Held in Trust for the benefit of Subcontractors and other Vendors [Bankruptcy Case D.E. #27], a true and correct copy of which is attached hereto as **Exhibit C**.
[7] Hagood Decl. at ¶ 45.

U.S.C. § 1292(b). *In re Charter Co.*, 778 F.2d 617, 620 (11th Cir. 1985); *In re Celotex Corp.*, 187 B.R. 746, 749 (M.D. Fla. 1995). Thus, a court will permit an interlocutory appeal of an order if "(1) the order presents a controlling question of law (2) over which there is substantial ground for difference of opinion among courts, and (3) the immediate resolution of the issue would materially advance the ultimate termination of the litigation." *In re Celotex Corp.*, 187 B.R. at 749; *see* 28 U.S.C. § 1292(b).

## II.      Leave to Appeal Should Be Granted

Plaintiffs have filed a direct appeal of the Bankruptcy Court's ruling on abstention under 28 U.S.C. §158(a)(1) under the collateral order doctrine. *In re Midgard Corp.*, 204 B.R. 764, 769 (10th Cir. BAP 1997); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The collateral order doctrine provides that an order may be treated as final for purposes of appeal if the order "[1] conclusively determine[s] the disputed question, [2] resolve[s] an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1355 (11th Cir. 2014). As the court held in *In re Midgard*, the ruling by the Bankruptcy Court refusing to abstain satisfies this standard because the Order conclusively determines the Bankruptcy Court's (and the Texas Bankruptcy Court's) jurisdiction over the State Court Action; the jurisdictional issues are completely separate from the underlying merits of the State Court Action; and the Order would be effectively unreviewable on appeal from a final judgment on the merits. 204 B.R.at 769; *see In re General Carriers Corp.*, 258 B.R. 181, 187 (9th Cir. BAP 2001).[8]

---

[8] Neither 28 U.S.C. § 1334(d) nor 28 USC §1452 (b) prevent district court review of a bankruptcy court's decision not to remand on abstention grounds. *E.g., In re Trujillo*, 485 B.R. 797, 804 (M.D. Fla. 2013); *In re Robertson*, 258 B.R. 470, 472 (M.D. Ala. 2001).

In the alternative, leave should be granted to appeal from the Order pursuant to 28 U.S.C. §158(a)(1) as all three elements of the test for interlocutory appeal noted above are satisfied. The Order decides controlling questions of law regarding the Bankruptcy Court's (and the Texas Bankruptcy Court's) jurisdiction as well as the appropriate venue for the State Court Action, there is substantial ground for difference of opinion regarding these issues, and immediate resolution of these issues would materially advance the ultimate termination of the litigation. *See In re Celotex Corp.*, 187 B.R. at 749.

First, the Order decides controlling questions of law because it finally determines the jurisdiction of the Bankruptcy Court (and the Texas Bankruptcy Court) to hear this state law action under abstention principles and whether Plaintiffs' choice of a Florida forum for this Florida dispute should be honored. *In re Midgard,* 204 B.R.at 770. Courts have found that orders conclusively resolving issues of law critical to the progress of the case satisfy this requirement. *See, e.g., In re Midgard,* 204 B.R.at 770 (abstention*); Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982) (holding that issues of subject matter jurisdiction were "controlling issues" that would justify interlocutory appeal under 28 U.S.C. § 1292(b)); *General Lending Corp. v. Cancio*, No. 10-cv-23903, 2011 WL 4424427 (S.D. Fla. Sept. 22, 2011) (granting leave to appeal bankruptcy order vacating dismissal); *In re Seminole Walls & Ceilings Corp.*, 388 B.R. 386, 390-91 (M.D. Fla. 2008 (granting leave to appeal order permitting repudiation of settlement before approval by the bankruptcy court); *In re Pacific Forest Products Corp.*, 335 B.R. 910, 919-20 (S.D. Fla. 2005) (granting leave to appeal bankruptcy court order that held that a check kiting scheme established as a matter of law intent to defraud).

Second, there is substantial room for difference of opinion as to the abstention and transfer rulings.  Specifically, 28 U.S.C. § 1334, provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

Thus, "a bankruptcy court must abstain from hearing a state-law claim if (1) the claim has no independent basis for federal jurisdiction, other than § 1334; (2) the claim is related to, but does not arise under or in, a bankruptcy case; (3) an action has been commenced in state court; and (4) that action can be timely adjudicated in that state-court proceeding."  *In re Kachkar*, 2019 WL 1567760 (11th Cir. Apr. 11, 2019).

The Bankruptcy Court ruled that the first and third elements of the mandatory abstention test were met, Order at 3, and further found that neither Texas nor Florida would be a faster forum for the dispute.  *Id.* at 3, 5.  Therefore, this Court's ruling turned on whether the action was a core proceeding, that is, whether it is related to but does not arise under or in, a bankruptcy case.  The Bankruptcy Court ruled that the State Court Action is a core proceeding because it is "the most important issue to resolve in determining whether UOB can confirm a plan" and because it "significantly affects the administration of UOB's estate and will adjust the debtor-creditor relationship between UOB and Southstar."  Order at 4.

The case law defining what is a core proceeding demonstrates that the Bankruptcy Court's analysis was error.  Core proceedings "are those that 'involve . . . a right created by the federal bankruptcy law' or that 'would arise only in bankruptcy,' such as 'the filing of a proof of

claim or an objection to the discharge of a particular debt.'" *Wortley v. Bakst*, 844 F.3d 1313, 1319 (11th Cir. 2017) (quoting *In re Toledo*, 170 F.3d 1340, 1348 (11th Cir. 1999)). Indeed, 28 U.S.C. § 157(b)(2) has been consistently construed as *not* "conferring core status on a debtor's lawsuit based upon a state law cause of action that otherwise is not involved in the bankruptcy case." William L. Norton, Jr., 1 *Norton Bankr. L. & Prac.* 3d § 4:72 (July 2018 Update) (citing numerous cases).

The State Court Action is a non-core proceeding as it solely involves "garden variety state-law claims." *In re Artecity Mngmt., LLC*, Adversary No. 10-03595-BKC-AJC, 2010 WL 4340110, at *2 (Bankr. S.D. Fla. Oct. 25, 2010) (construction litigation deemed non-core). The State Court Action does not "invoke substantive rights created by federal bankruptcy law or that exist exclusively in the bankruptcy context." *Wortley*, 844 F.3d at 1318. The mere assertion of claims against an entity that subsequently files a bankruptcy case does not "[change] the character of a prepetition lawsuit against the debtor." *Lennar Corp.*, 430 B.R. at 264 (citing *In re Toledo*, 170 F.3d 1340 (11th Cir. 1990); *In re Wood,* 825 F.2d 90 (5th Cir. 1987)). *See also Julian Depot Miami, LLC v. Home Depot U.S.A., Inc.*, Civil Action No. 17-22475-Civ-Scola, 2018 WL 3404133, at *2 (S.D. Fla. July 12, 2018) (importance of action to bankruptcy case does not transform non-core proceeding to core proceeding).

At most, the State Court Action is a non-core proceedings that is "related to" the bankruptcy case. "The test for determining whether a civil proceeding is 'related-to' bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Nassau Dev. Of Village W. Corp.*, 547 B.R. 857, 860 (Bankr. S.D. Fla. 2016) (citing *Homestead v. Boone*, 52 F.3d 958, 960 (11th Cir. 1995)). The Bankruptcy

Court's reasoning supports the conclusion that the State Court Action is "related to" the bankruptcy case, not that it is a core proceeding. Thus, there is a substantial basis for difference of opinion regarding the mandatory abstention ruling.

The same is true regarding the Bankruptcy Court's rulings regarding permissive abstention and transfer of venue. The Bankruptcy Court addressed these two issues together, and concluded that permissive abstention was not appropriate but transfer to the Texas Bankruptcy Court was appropriate under 28 U.S.C. §§ 1404 and 1412. In ruling on these issues, the Bankruptcy Court committed error in several respects. Regarding permissive abstention, the Bankruptcy Court purported to rely on the test stated in *In re Phoenix Diversified Inv. Corp.*, 439 B.R. 231, 245 (Bankr. S.D. Fla. 2010), Order at 5, but omitted several of the factors stated in *In re Phoenix*, including "the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties" and the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court." 439 B.R. at 245-46. The omission of these factors, both of which weigh heavily in favor of abstention, was prejudicial error. Moreover, the Bankruptcy Court's legally erroneous conclusion that the State Court proceeding was a core proceeding also infected the permissive abstention analysis.

As to transfer, the Bankruptcy Court committed error in relying on 28 U.S.C. §§ 1404 and 1412. Section 1412 provides: "A district court may transfer a case or proceeding **under title 11** to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. The Eleventh Circuit in *In re Toledo,* 170 F.3d 1340, 1348-49 (11th Cir. 1999), defined "arising under" proceedings as those "matters invoking a substantive right

created by the Bankruptcy Code." *Id.* Similarly, in *Alderwoods Group, Inc. v. Garcia*, 682 F.3d 958, 973 (11th Cir. 2012), the Eleventh Circuit again emphasized that only cases or proceedings arising under title 11 may be transferred under Section 1412. Plainly, this section does not apply to the State Court Action.

Further, Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." *Id.* The threshold issue under Section 1404(a) is whether the action "might have been brought" in the proposed transferee federal district court. *Mainstream Dev. Group, Inc.*, No. 6:05-cv-1895, 2006 WL 8439419, at *3 (M.D. Fla Mar. 16, 2006). "An action 'might have been brought' in a proposed transferee court (1) if that Court has jurisdiction over the subject matter of the action, (2) if venue is proper there, and (3) if Defendant is amenable to process issuing out of the transferee court." *Id.* (citing *Miot v. Kechijian*, 830 F. Supp. 1460, 1465 (S.D. Fla. 1993)). Here, a Texas federal court could not possess subject matter jurisdiction over this action because no federal law is implicated and there is no diversity of citizenship among the parties to this action. Thus, Section 1404(a) is inapplicable to this action and does not permit the transfer of this action to Texas. In this light, there is substantial room for difference of opinion as to the abstention rulings as well as the transfer ruling.

Third, an appeal on these issues will materially advance the case. As noted, the case is in the early stages, and a ruling will avoid the possibility of substantial litigation in a court that lacks jurisdiction under the abstention doctrine or is the wrong court under transfer principles.

As demonstrated above, all three elements of the test for granting leave to appeal are satisfied in this case. Accordingly, the Court should grant Plaintiffs leave to appeal the Bankruptcy Court's Order Granting Motion to Transfer and Denying Motion for Remand.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant leave for Plaintiffs to appeal the Order both as to the mandatory and permissive abstention issues as well as to the transfer of venue issue.

Respectfully submitted,

*/s/ Matthew I. Kramer*
MICHAEL A. HORNREICH
Florida Bar No.: 379972
MATTHEW I. KRAMER
Florida Bar No.: 0937231
**WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC**
255 South Orange Avenue, Suite 1260
Orlando, Florida 32801
Phone: 407.734.7000
Fax:     407.930.9180
mhornreich@wwhgd.com
mkramer@wwhgd.com
*Counsel for Plaintiffs Southstar Capital
Group I, LLC, Cottington Road TIC, LLC
and Durban Road TIC, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I further certify that I mailed the foregoing document by first-class mail to the following participants:

Jason A. Perkins, Esq.
Scott A. Richards, Esq.
Carlton Fields Jorden Burt, PA
PO Box 1171
Orlando, FL 32802-1171
(407) 849-0300

Matthew Okin, Esq.
Okin Adams LLP
1113 Vine Street Suite 240
Houston, TX 77002

Omar J Alaniz, Esq.
Baker Botts LLP
2001 Ross Avenue
Dallas, TX 75201-2980
214-953-6593

Katherine Brooker, Esq.
Joseph Colagiovanni, Esq.
Baker Botts LLP
One Shell Plaza
910 Louisiana St
Houston, TX 77002

Counsel to Urban Oaks Builders, LLC

Esther A McKean, Esq.
Akerman Senterfitt
Post Office Box 231
Orlando, FL 32802-0231

Bryan T. West, Esq.
Joseph L. Rebak, Esq.
Akerman LLP
Suite 1100

Three Brickell City Centre
98 Southeast Seventh St
Miami, FL 33131-1714


Counsel to 1662 Multifamily LLC, Hines 1662 Mulitfamily, LLC, Hines Investment
Management Holdings Limited Partnership, HIMH GP, LLC, Hines Real Estate Holdings
Limited Partnership, Hines Interest Limited Partnership, JCH Investments, Inc.


*/s/ Matthew I. Kramer*
Matthew I. Kramer

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov



SOUTHSTAR CAPITAL GROUP, I, LLC    )
et al.,                            )
                                   )
            Plaintiffs,            )
                                   )       Miscellaneous Proceeding
vs.                                )       6:19-mp-00001-KSJ
                                   )
1662 MULTIFAMILY LLC, et al.,      )
                                   )
            Defendants.            )
_____)

## ORDER GRANTING MOTION TO
## TRANSFER AND DENYING MOTION FOR REMAND

This miscellaneous proceeding came before the Court on February 13, 2019, to consider Urban Oaks Builders LLC's Motion to Transfer Venue[1] and Southstar Capital Group, I, LLC's Dispositive Motion to Abstain and Remand.[2] The Motion to Transfer is granted. The Motion to Abstain and Remand is denied without prejudice.

Although the parties outlined the procedural history more thoroughly in their papers, a brief undisputed background is merited. Urban Oaks Builders LLC ("UOB" or the "Debtor") is a Delaware limited liability company with its principal place of business in Houston, Texas.[3] Between 2014 and 2016, UOB, acting as a general contractor, built a large apartment complex (the "Project") in Osceola County, Florida.[4] The Project later was sold to Southstar for $67 million.[5] Southstar identified several alleged substantial construction defects on the Project, some of which

---

[1] Doc. No. 2. Opposition filed at Doc. No. 4. Affidavits in opposition filed at Doc. Nos. 16, 19.
[2] Doc. No. 3. Response filed at Doc. No. 5.
[3] Doc. No. 2, ¶ 7.
[4] Id. at ¶¶ 1, 12, 14.
[5] Id. at ¶ 14; Doc. No. 3, p. 4; Doc. No. 5, p. 2.

it claims were "hidden."[6] The parties attempted to negotiate their dispute;[7] eventually Southstar[8]

sued UOB in Osceola County, Florida based on the alleged defective work.[9] UOB then filed a

declaratory judgment action in Osceola County against its insurance carriers arguing the carriers

failed to defend UOB in the Construction Lawsuit.[10] The Coverage Lawsuit was removed to

Orlando federal court, remanded to the state court, and then voluntarily dismissed.[11] Only the

Construction Lawsuit between Southstar and UOB related entities remains pending.

     Asserting the costs of pending litigation and UOB's potential liabilities to Southstar, UOB

filed a Chapter 11 bankruptcy petition in Texas.[12] Soon after, the Construction Lawsuit was

removed to the United States District Court in Orlando, and the Honorable Anne Conway referred

the Construction Lawsuit to this court for review.[13] This court has two pending motions before it

requesting the Construction Lawsuit either return to Osceola County or transfer to Texas.

     The standards for transfer, abstention, and remand overlap. All require a balancing test

analyzing similar factors to determine if the Construction Lawsuit should return to Osceola County

---

[6] Doc. No. 2, ¶ 15; Doc. No. 3, p. 5.

[7] Doc. No. 2, ¶ 16.

[8] When the Court uses "Southstar" it means these entities: Southstar Capital Group I, LLC; Cottington Road TIC, LLC; and Durban Road TIC. Doc. No. 2, ¶ 1.

[9] Southstar named these defendants: 1662 Multifamily LLC; Hines 1662 Multifamily LLC; Hines Investment Management Holdings Limited Partnership; HIMH GP, LLC; Hines Interest Limited Partnership; JCH Investments, Inc; and Urban Oaks Builders LLC. The Court will refer to these entities collectively as "UOB" or the "Debtor," but Urban Oaks Builders LLC is the only Debtor in the Texas Bankruptcy Court. The rest of the named defendants are Delaware or Texas entities. Doc. No. 2, ¶¶ 1, 11. The state court case is styled *Southstar Capital Group I, LLC et al. v. 1662 Multifamily LLC et al.*, Case No. 2018-CA-000415-OC in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County Florida (the "Construction Lawsuit"). Doc. No. 2, ¶¶ 1, 19; Doc. No. 3, pp. 3, 6. The Complaint includes causes of action of fraudulent inducement, breach of contract, violations of Florida building codes, negligence, and rescission. Doc. No. 3, p. 3

[10] Doc. No. 2, ¶ 2. The case is styled *Hines Interests Limited Partnership et al. v. Southstar Capital Group I, LLC, et al.*, Case No. 2018-CA-01845, in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida (the "Coverage Lawsuit"). Doc. No. 2, ¶¶ 2, 22; Doc. No. 3, p. 7.

[11] The removed case was styled *Hines Interests Limited Partnership, et al. v. Southstar Capital Group, I, LLC et al.*, Case No. 6:18-cv-1147-ORL-22DCI in the United States District Court for the Middle District of Florida. The case was remanded on December 20, 2018. Doc. No. 72 in Case No. 18-1147. The state court granted the Motion to Voluntarily Dismiss the Coverage Lawsuit on March 19, 2019.

[12] Doc. No. 2, ¶ 23; Doc. No. 3, p. 7. The petition was filed on August 31, 2018. Case No. 18-34892 in the United States Bankruptcy Court for the Southern District of Texas.

[13] The removed Construction Lawsuit was styled *Southstar Capital Group I, LLC et al. v. 1662 Multifamily LLC et al.*, Case No. 6:18-cv-01453-ACC-DCI in the United States District Court for the Middle District of Florida. The order of referral to this Court was entered on January 2, 2019. Doc. No. 55 in Case No. 18-1453.

or transfer to the Texas Bankruptcy Court. Southstar requests the Court consider the mandatory abstention, permissive abstention, and remand issues first.

These are the key facts underpinning the Court's opinion: Both the Construction Lawsuit and the Texas bankruptcy case are in their early stages. Nothing in the record suggests either Texas or Florida will be a faster forum for this dispute. The Construction Lawsuit is the primary reason for the bankruptcy filing, is a core proceeding, and its resolution will dictate whether UOB can confirm a Chapter 11 plan or reorganization. Judicial efficiency favors litigating disputes in one forum—the home bankruptcy court. Given these key facts, the Court turns to the doctrines of abstention, remand, and transfer.

## **Mandatory Abstention**

"Mandatory abstention strikes a balance between the competing interests of bankruptcy and state courts."[14] Claims in bankruptcy court are subject to mandatory abstention under 28 U.S.C. § 1334(c)(2) "if (1) the [claims have] no independent basis for federal jurisdiction, other than § 1334; (2) the [claims are] related to, but does not arise under or in, a bankruptcy case[, in other words, are non-core]; (3) an action has been commenced in state court; and (4) that action can be timely adjudicated in that state-court proceeding."[15] Southstar must prove these elements by a preponderance of the evidence.[16] The first and third element are met, but Southstar has not met its burden to show *all* elements of mandatory abstention are present, primarily because this dispute is a core proceeding.

Examples of what constitutes a "core" proceeding are listed in 28 U.S.C. § 157(b).[17] "Because the statutory list is not exhaustive, courts look beyond the list and to the purpose of the

---

[14] *Christo v. Padgett*, 223 F.3d 1324, 1331 (11th Cir. 2000).
[15] *In re Kachkar*, No. 18-10218, 2019 WL 1567760, at *4 (11th Cir. Apr. 11, 2019).
[16] *Alexander v. Alternative Debt Portfolios, LLC (In re EZ Pay Servs., Inc.)*, 390 B.R. 421, 424 (Bankr. M.D. Fla. 2007).
[17] *See also Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33, 134 S. Ct. 2165, 2171, 189 L. Ed. 2d 83 (2014) (discussing list of core proceedings).

statute to determine whether a proceeding is 'core.'"[18] The United States Supreme Court explained that the statutory list of core proceedings under 28 U.S.C. § 157(b) are merely examples of such matters.[19] Courts have interpreted the "broadly inclusive language" of this list to encompass a wide range of proceedings.[20]

If a debtor files a Chapter 11 reorganization petition rather than a Chapter 7 petition, courts are more likely to deem a case "core."[21] Southstar's claims against UOB here raise alleged pre-petition bad acts and liabilities of the UOB that comprise the "vast majority" of liabilities against the Debtor and its bankruptcy estate.[22] UOB cannot proceed with its reorganization efforts without resolving these claims. And, Southstar must file a claim in UOB's bankruptcy case to collect on any pre-petition liability UOB may owe. Southstar may have a zero claim or a significant claim against UOB. We do not know. But, either way, this determination is the most important issue to resolve in determining whether UOB can confirm a Chapter 11 plan. At a minimum, resolving the Construction Lawsuit significantly affects the administration of UOB's estate and will adjust the debtor-creditor relationship between UOB and Southstar. It is a core proceeding under 28 U.S.C. § 157(b)(2). Mandatory abstention is not appropriate.

### Permissive Abstention/Equitable Remand versus Transfer

The test for permissive abstention and remand, as sought by Southstar, versus transfer, as sought by UOB, both require a balancing test considering similar factors. Courts generally consider the same factors under both.

Under 28 U.S.C. § 1334(c)(1), a federal court may abstain from hearing a proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law."

---

[18] *Carapella v. State Farm Fla. Ins. Co.*, No. 8:18-CV-2396-T-36CPT, 2019 WL 494584, at *8 (M.D. Fla. Feb. 8, 2019).
[19] *Stern v. Marshall*, 564 U.S. 462, 476, 131 S. Ct. 2594, 2605, 180 L. Ed. 2d 475 (2011).
[20] *In re EZ Pay Servs., Inc.*, 390 B.R. at 430.
[21] *Carapella*, 2019 WL 494584, at *7.
[22] Doc. No. 5, p. 7.

Relevant factors include: (1) the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; (7) whether a separate state law case is pending; (8) whether the issues are core proceedings or are directly related to the debtor's reorganization; and (9) the prejudice to the defendants.[23] Courts may determine the relative weight afforded each factor.[24]

On UOB's transfer request, under 28 U.S.C. § 1412, a court may transfer a proceeding in the interest of justice or for the convenience of the parties.[25] The standard under 28 U.S.C. § 1404 is similar. These analyses are case specific and subject to broad discretion.[26] The factors underlying both transfer statutes overlap. The party promoting transfer must show transfer is warranted.[27] "Interest of justice" is a flexible standard. The Court should consider whether transfer would "promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness."[28] These factors include examining whether the parties and witnesses will be inconvenienced, the defendant's choice of forum, where the claim arose, and whether the transferee court is familiar with the laws involved.[29] Efficient administration is often considered the most important factor in deciding whether to transfer a proceeding.[30]

Either forum—the Osceola County Florida Court or the Texas Bankruptcy Court—is competent and capable. Both cases are in their early stages. And nothing posits one court versus the other as more able to speedily resolve the claims.

---

[23] *In re Phoenix Diversified Inv. Corp.*, 439 B.R. 231, 245 (Bankr. S.D. Fla. 2010).
[24] *Id.*
[25] 28 U.S.C. § 1412.
[26] *Creekridge Capital, LLC v. Louisiana Hosp. Ctr., LLC*, 410 B.R. 623, 629 (D. Minn. 2009).
[27] *Id.*
[28] *In re Penn-Mont Benefit Servs., Inc.*, No. 3:13-BK-05986-JAF, 2013 WL 6405046, at *10 (Bankr. M.D. Fla. Dec. 6, 2013).
[29] *Id.*
[30] *Creekridge Capital*, 410 B.R. at 630 ("In evaluating the interest of justice factors, several courts have found the most important factor is whether transfer would promote the economic and efficient administration of the bankruptcy estate.").

Factors for both sides support a remand to Florida or a transfer to Texas, and this is a close question. The Texas Bankruptcy Court more efficiently however can decide *all* liabilities against the Debtor, including Southstar's claims, in its administration of the UOB bankruptcy case. Only the Texas Bankruptcy Court can confirm a plan of reorganization and arrange for the payment of Southstar's claims.

However, state law issues predominate in the Construction Lawsuit raising problems with a large apartment complex built in Central Florida. Local Florida building codes are implicated. Many witnesses are in Florida, which will make the trial more expensive if the case is transferred to Texas.

One party is prejudiced by either decision. If the case returns to Florida state court, UOB must litigate both in Florida and simultaneously prosecute its Texas bankruptcy case. If the dispute transfers to Texas, Southstar must litigate its claims relating to a Florida construction project in Texas when many witnesses are in Florida.

After reviewing the factors above and others argued by the parties, the Court concludes transferring the Construction Lawsuit to Texas and denying the request for permissive abstention and equitable remand is the best answer. One court, the Texas Bankruptcy Court, can resolve all issues between the parties. It is better able to more efficiently administer both the Construction Lawsuit and the bankruptcy case as one unit.

The biggest argument against transfer is the inconvenience to Florida witnesses testifying on alleged construction defect issues in a distant court in Texas. To lessen this impediment, I offer a solution. This Court has two open and unused courtrooms. We gladly welcome and can accommodate the needs of the Texas Bankruptcy Court to hold hearings and trials in our facility, if desired, either in person or via video. The witnesses then could then testify in person with no extra costs or prejudice. Any differential in discovery costs or travel costs are *de minimus*.

Further, recognizing this is a close question and UOB's bankruptcy case is in its early days, this Court will transfer this case without prejudice. Southstar has a pending motion to dismiss. Perhaps the Texas Bankruptcy Court will soon dismiss the bankruptcy case and remand the Construction Lawsuit to Florida. Or perhaps, the Texas Bankruptcy Court later will determine remand was the better choice during its administration. If so, factors would justify a different outcome. But, until then, this Court will deny Southstar's request for abstention and remand, and grant UOB's Motion to Transfer.

Accordingly, it is

**ORDERED:**

1. The Motion for Abstention or Remand (Doc. No. 3) is **DENIED without prejudice.**

2. The Motion to Transfer (Doc. No. 2) is **GRANTED.**

3. This proceeding shall be transferred to the United States Bankruptcy Court for the Southern District of Texas.

**DONE AND ORDERED** in Orlando, Florida on May 7, 2019.

KAREN S. JENNEMANN
United States Bankruptcy Judge

###

Attorney, Jason Perkins, is directed to serve a copy of this order on all interested parties who are non-CM/ECF users and file a proof of service within three days of entry of the order.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION



| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **URBAN OAKS BUILDERS LLC,** [1] | § | **Case No. 18-34892** |
| | § | |
| Debtor. | § | **Chapter 11** |

## DECLARATION OF TODD HAGOOD IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Todd Hagood, hereby declare under penalty of perjury:

1.     I am the Vice President of Construction for Urban Oaks Builders LLC (the "**Debtor**" or "**UOB**").  In such capacity, I am generally familiar with the Debtor's operations, business affairs, books and records.  I am authorized to submit this Declaration on behalf of the Debtor.

2.     Except as otherwise indicated, all facts set forth in this declaration (the "**Declaration**") are based upon my personal knowledge, my discussions with members of the Debtor's management team and advisors, my review of relevant documents and information concerning the Debtor's business, financial affairs, and restructuring initiatives, or any opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

3.     I am generally familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records.  I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this chapter 11 case (the "**Chapter 11 Case**") and in support of:  (a) the Debtor's petition for relief under title 11 of the

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Urban Oaks Builders LLC (8662).

United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Pleadings**").

4.     To familiarize the Court with the Debtor, the forces that caused the Debtor to commence this case, and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized in five parts. Part I provides an introduction to the Company and detailed information on its corporate history and business operations. Part II provides an overview of the Debtor's organizational structure and capital structure. Part III describes the circumstances leading to the commencement of this Chapter 11 Case. Part IV sets forth the Debtor's objectives for this Chapter 11 Case. Part V sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with this Chapter 11 Case.

## PRELIMINARY STATEMENT[2]

5.     The Debtor is a general contracting and construction management company, with a focus on large multifamily residential projects primarily for entities affiliated with Hines Interests Limited Partnership ("**Hines**"). Founded in 1957, Hines is a real estate development and investment company that operates throughout Texas, the United States, and across the globe.

6.     In 2014, the Debtor contracted with 1662 Multifamily LLC ("**1662 Multifamily**"), an affiliate of Hines, for the construction of a 306-unit apartment project in Celebration, Florida (the "**Celebration Apartments**"). UOB completed the Celebration Apartments in March 2016. Later that year, 1662 Multifamily sold the Celebration Apartments to Southstar Capital Group I, LLC ("**Southstar**") in an "As Is, Where Is" sale. The Debtor was not a party to the sale, nor was the Debtor's construction contract with 1662 Multifamily assigned to Southstar.

---

[2] Capitalized terms used in this Preliminary Statement shall have the meanings set forth below.

7. In February 2017, Southstar notified the Debtor that some of the cantilevered balconies at the Celebration Apartments were deflecting downward. The Debtor, the architect, and the engineer of record for the project then inspected the situation and determined that the balconies needed to be shored and supported to prevent further movement, and the balcony structure should be exposed, and new structural supports should be installed, so that the temporary shoring could be removed and the affected units could be re-occupied. The Debtor began performing the work to stabilize and repair the corner balconies in May 2017.

8. While the Debtor was performing this work, the Osceola County Building Department (the "**County**") posted a Notice of Evacuation at the Apartments on August 14, 2017. This notice stated that the buildings were unsafe to occupy and purported to require that the buildings be vacated within 30 days. Instead of challenging the County's Notice of Evacuation, Southstar immediately ordered all residents to vacate the buildings within 30 days and began terminating leases, which are the ultimate source of revenue for the Celebration Apartments. Southstar refused to take any action to challenge the Building Department's Notice of Evacuation despite receiving two reports prepared by a forensic engineering consultant (Wiss Janey Elstner Associates, Inc. "**WJE**"), stating that in WJE's professional engineering opinion the Apartments were safe to occupy.

9. During the fall and winter of 2017-2018, UOB continued with the work to stabilize and repair the cantilevered corner balconies, and the parties attempted to negotiate a resolution of the issues at the Apartments. Nevertheless, in February 2018 Southstar filed suit against the Debtor, 1662 Multifamily, Hines 1662 Multifamily LLC, Hines Investment Management Holdings Limited Partnership, HIMH GP LLC, Hines Real Estate Holdings Limited Partnership, Hines, and JCH Investments, Inc. (together with 1662 Multifamily the "**Other Defendants**") alleging alter

3

ego liability of the Debtor and the Other Defendants and asserting claims against all of them for: (a) defective construction based on negligence and claimed violations of the Florida Building Code, and (b) fraudulent non-disclosure/fraudulent inducement.

10.     Southstar has alleged that the cost to repair the allegedly defective work and resulting damages (including lost rent allegedly caused by a need to vacate the apartments resulting from the defective work) total to over $45,000,000. These liabilities increase further at a rate of $451,000 with each passing month, based on the lost rent claim alone.

11.     But these potential liabilities, standing alone, are not the reason the Debtor is seeking Chapter 11 protection. As a responsible general contractor, Debtor had procured multiple layers of commercial general liability insurance applicable to its work on the Celebration Apartments, with a total of $52 million of policy limits. However, as discussed further in Section III.D, several of the Debtor's insurance carriers became embroiled in coverage disputes with one another and wrongfully refused to provide coverage for and defend and indemnify the Debtor and the Other Defendants against Southstar's claims—contrary to the terms of the insurance policies and applicable law. As a result of the insurance carriers' failure to comply with their contractual obligations, the Debtor filed a declaratory judgment action against them which is currently pending before the Honorable Anne C. Conway, United States District Court for the Middle District of Florida.

12.     As a result of, Southstar's claims, the uncertainty caused by the insurance carriers' unwillingness to cover UOB, and the litigation costs of simultaneously defending against Southstar's claims and litigating against its insurance carriers, the Debtor now voluntarily files for chapter 11 bankruptcy relief. Through this Chapter 11 Case, the Debtor seeks to implement a plan

4

that will result in creditors being paid 100% of their allowed claims, while enabling the Debtor to emerge from chapter 11 with the ability to save its business and the livelihood of its employees.

## I. DESCRIPTION OF THE DEBTOR'S CORPORATE HISTORY AND BUSINESS OPERATIONS

13. The Debtor was formed in 2011 and provides general contracting and construction management services for large and medium-sized multifamily residential construction projects across the United States, primarily for entities affiliated with Hines. Hines is a real estate development and investment company that operates throughout Texas, the United States, and across the globe.

14. The Debtor's principal office is located in Houston, Texas, and most of its employees and officers are likewise located in Texas.

15. The Debtor is currently the general contractor for three large multifamily projects, located in Denver, San Antonio, and Houston. Each project is based on a guaranteed maximum price contract, with contract values of approximately $67 million, $52 million, and $112 million, respectively.

## II. THE DEBTOR'S ORGANIZATIONAL AND CAPITAL STRUCTURE

16. The Debtor, UOB, is a Delaware limited liability company that is owned by two Texas closely held corporations, POC Holdings 1, Inc. and POC Holdings 2, Inc. POC Holdings 2, Inc. is the Debtor's sole managing member. The Debtor's members are special purpose entities in which Gerald D. Hines and Jeffrey C. Hines are the sole indirect shareholders, respectively. No Hines' entities have any ownership interest in or management control over the Debtor, which is operated independently of Hines. UOB is a party to a Servicing Agreement with Hines, executed in 2011, pursuant to which UOB pays Hines for certain administrative services such as information technology, human resources, cash management, risk management and accounting.

17.     Although the Debtor operated profitably from 2011 to 2017, beginning in 2017, the Debtor began to incur substantial expenses and costs in connection with the claims brought by Southstar Capital Group I, LLC ("**Southstar**") regarding alleged construction defects at a multifamily apartment project the Debtor was the general contractor for in Celebration, Florida (the "**Celebration Apartments**"), in relation to Southstar's purchase of the Celebration Apartments.

18.     To finance these expenses, beginning on September 18, 2017, POC Holdings 2, Inc. made several loan advances to the Debtor, totaling $3,630,645.86.

19.     While the Debtor continued to earn sufficient cash-flow from its active construction projects to pay its ordinary debts and obligations as they came due, the Debtor lacked sufficient cash reserves to continue to finance the ongoing litigation over construction defects at the Celebration Apartments (discussed below) or even the initial expenses of a Chapter 11 bankruptcy filing.  In order to induce POC Holdings 2, Inc. to make an additional $125,000.00 advance to continue to fund the Debtor through this Chapter 11 case, and to permit the Debtor to continue performing on its construction projects, the Debtor and POC Holdings 2, Inc. entered into that certain Security Agreement dated August 21, 2018, and Promissory Note dated August 21, 2018 (the "**Prepetition Secured Loan**").  As of the Petition Date, the Prepetition Secured Loan represented the Debtor's only secured debt.  In addition, the Debtor has obligations to its vendors, employees, Hines, and other parties, including the asserted unliquidated and contingent claims of Southstar and its affiliates, discussed further below.

## III.  CIRCUMSTANCES LEADING TO THE
## COMMENCEMENT OF THIS CHAPTER 11 CASE

20.    As noted above, as of the Petition Date, the Debtor was engaged in litigation initiated by Southstar stemming from alleged construction defects at the Celebration Apartments that the Debtor built.

### A.    1662 Multifamily hires the Debtor to construct a multifamily apartment project and sells the project to Southstar

21.    In July of 2014, the Debtor contracted with 1662 Multifamily for the construction of the Celebration Apartments.

22.    The Celebration Apartments consist of six identical four-story residential apartment buildings and a clubhouse, with a total of 306 residential units.  Each of the apartment buildings features L-shaped cantilevered balconies supported by three cantilevered beams on the second through fourth floor corner apartment units, with smaller rectangular cantilevered balconies on the "interior" units.

23.    The Debtor completed the Celebration Apartments in March 2016.  Later that year, 1662 Multifamily sold the Celebration Apartments to Southstar through an Agreement of Sale and Purchase dated July 1, 2016.  The Debtor was not a party to this transaction and as the sale was on an an "as-is where-is" basis, no warranty was given by the Debtor to Southstar in connection with the sale, and UOB's construction contract with 1662 Multifamily was not assigned to Southstar by 1662 Multifamily.

### B.    Southstar notifies the Debtor and 1662 Multifamily that the corner balconies are deflecting downwards, the Debtor begins repairs, and the County yellow tags the Apartments.

24.    In February 2017, Southstar Management, I LLC ("**Southstar Management**"), an affiliate of Southstar, notified the Debtor that some of the cantilevered corner balconies of the Celebration Apartments were deflecting downward.  The Debtor, the architect and engineer of

7

record for the Celebration Apartments, then inspected the situation and determined that the balconies needed to be shored and supported to prevent further movement, the balcony structure exposed, and new structural supports installed, at which time the temporary shoring could be removed, and the affected units reoccupied. The Debtor began performing the work to stabilize and repair the corner balconies in May 2017.

25.     While the Debtor was performing this work, the Osceola County Building Department (the "**County**") posted a Notice of Evacuation at the Celebration Apartments on August 14, 2017 stating that the buildings were unsafe to occupy and requiring that the buildings be vacated within 30 days. Instead of seeking to challenge the County's Notice of Evacuation, Southstar immediately ordered all residents to vacate the buildings within 30 days and began terminating leases. Notably, the County did not follow its own ordinances requiring notice and hearing before issuing an evacuation order, and the County only provided minimal supporting reasons for its decision.

26.     Southstar refused to take any action to challenge the Notice of Evacuation despite receiving two reports prepared by a forensic engineering consultant, WJE, stating that in WJE's professional engineering opinion the Celebration Apartments were safe to occupy.

**C.      The parties' attempts to reach a negotiated resolution fail due to Southstar's demands for a "like new" building.**

27.     Instead of seeking to challenge the yellow tag, on September 26, 2017, Southstar sent the Debtor and 1662 Multifamily a demand, setting forth three proposed options regarding the Celebration Apartments: (1) to buy the Celebration Apartments back for the price Southstar paid; (2) to fix all claimed deficiencies that Southstar identified (such that the buildings would be placed in an "as new" condition); or (3) to litigate.

28.     On September 28, 2017, Southstar provided the Debtor with a draft report prepared by Karins Engineering Group, Inc., which purported to identify numerous construction defects at the Celebration Apartments unrelated to the corner balconies.  Southstar provided this report (without any changes from the draft) to the County on October 6, 2017.

29.     During the fall and winter of 2017-2018, the Debtor continued with the work to stabilize and repair the cantilevered corner balconies, and the parties attempted to negotiate a resolution of the issues at the Celebration Apartments.  In total, the Debtor spent over $2.3 million to repair and resolve the issues.

30.     These efforts at a negotiated resolution failed and in February 2018 Southstar filed suit against the Debtor, 1662 Multifamily, Hines 1662 Multifamily LLC, Hines Investment Management Holdings Limited Partnership, HIMH GP LLC, Hines Real Estate Holdings Limited Partnership, Hines Interests Limited Partnership, and JCH Investments, Inc. (together with 1662 Multifamily the "**Other Defendants**") alleging alter ego liability of the Debtor and the Other Defendants and asserting claims against all of them for: (a) defective construction based on negligence and claimed violations of the Florida Building Code; and (b) fraudulent non-disclosure/fraudulent inducement.

31.     Southstar has alleged that the cost to repair the allegedly defective work and resulting damages (including lost rent allegedly caused by a need to vacate the apartments resulting from the defective work) total to over $45,000,000.  These potential liabilities increase further with each passing month, at a rate of $451,000, based on the lost rent claim alone.

**D. The Debtor's insurance carriers refuse to defend, and the Debtor brings a declaratory judgment action against them.**

32. These liabilities were magnified by the conduct of the Debtor's insurers, which gave rise first to a declaratory judgment action by the Debtor against them and give rise now to this Chapter 11 filing.

33. With respect to the Celebration Apartments, the Debtor and the Other Defendants are the named insureds on several commercial general liability insurance policies with Gemini Insurance Company ("**Gemini**"), Ironshore Specialty Insurance Company ("**Ironshore**"), Navigators Specialty Insurance Company ("**Navigators**") and Great American Assurance Company ("**Great American**" and collectively the "**Insurance Carriers**").

34. Gemini's commercial general policy is the primary policy and provides the following limits: $2,000,000 each occurrence; $4,000,000 aggregate limit. Ironshore's policy is the first layer of excess and provides the following limits: $10,000,000 each occurrence, and $25,000,000 aggregate limit. Navigators' policy is the second layer of excess and provides the following limits: $15,000,000 each event; $15,000,000 aggregate limit. Great American's policy is the third layer of excess and provides the following limits: $25,000,000 each occurrence and $25,000,000 aggregate limit.

35. These insurance policies were issued as part of a property damage and general liability policies under a contractor-controlled insurance plan ("**CIP**") which provided general liability coverage for the Debtor, the Other Defendants, and the Debtor's subcontractors for their work on the Celebration Apartments.

36. The CIP acts as a single policy that covered construction of the entirety of the Celebration Apartments and obligates the Insurance Carriers to cover the Debtor and the Other Defendants for liability and property damage, including as alleged in Southstar's lawsuit. In total,

the policies issued by the Debtor's insurance carriers cover most, if not all, of Southstar's alleged damages in their suit against the Debtor and the Other Defendants.

37.     The purpose of the CIP was to drive costs down as to defense obligations and streamline indemnity and risk transfer as to the construction of the Celebration Apartments. One of the primary understood purposes of controlled insurance programs is to allow the parties to mount a "unified" defense avoiding disputes between the developer, contractor, and subcontractors who are involved in the controlled insurance program. By providing for the unified defense of this matter through the general contractor and developer the CIP was implemented to avoid the necessity of the contractor and developer pursuing indemnity and defense claims against the subcontractors which claims constitute covered contractual liabilities under the standard commercial general liability form. However, when any party to a controlled insurance program is required to pursue its defense pursuant to an indemnity claim, thus necessarily pursuing a contractual liability/insured contract claim, there is a threat of diminished limits.

38.     Upon learning of Southstar's claims in February 2017, the Debtor promptly provided notice to the Insurance Carriers. Throughout 2017 and the first half of 2018, the Debtor provided the Insurance Carriers with extensive information about Southstar's claims and repeatedly demanded that the Insurance Carriers defend and indemnify the Debtor.

39.     Instead of complying with their obligations under the CIP policies, the Insurance Carriers—and in particular Gemini and Ironshore—became embroiled in disputes with each other over which carrier was responsible for the defense against Southstar's claims. During the summer and fall of 2017, Gemini made several payments on behalf of the Debtor, totaling to Gemini's $2,000,000.00 single occurrence limit. However, upon reaching the single occurrence limit, Gemini claimed that the policy had been exhausted and disclaimed any duty to defend the Debtor.

Ironshore disagreed, claiming that Gemini's applicable limit was $4,000,000.00 due to multiple occurrences and that Gemini's payment without procurement of release is not payment of the loss, and thus that the Gemini policy had not been exhausted and Gemini is still obligated to defend the Debtor. As a result of this dispute, both Gemini and Ironshore refused to provide full coverage to the Debtor as required by the CIP policies. Instead each argued that it was the other's responsibility to do so.

40. To date, the Insurance Carriers have refused to provide coverage for and defend and indemnify the Debtor or the Other Defendants against the claims asserted by Southstar. As a result, the Debtor and the Other Defendants filed a lawsuit against Gemini, Ironshore, and Navigators in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida, styled *Hines Interests Limited Partnership, et. al. v. Southstar Capital Group I, LLC, et. al.*, Case No. 2018-CA-01845 seeking a declaratory judgment requiring them to honor their obligations to the Debtor in relation to Southstar's claims. On July 17, 2018 that lawsuit was removed by Gemini to the United States District Court for the Middle District of Florida, Orlando Division, in an action styled *Hines Interests Limited Partnership, et. al. v. Southstar Capital Group I, LLC, et. al.*, Case No. 6:18-CV-1147-ORL-22DCI, (the "**Coverage Litigation**") where it is currently pending. In this lawsuit, Ironshore filed a crossclaim against Gemini as to its duty to defend the Debtor and other insureds.

41. Because of these potential liabilities, the rising litigation cost and uncertainty caused by Gemini, Ironshore, together with Navigators' unwillingness to defend and indemnify UOB and the Other Defendants as required by law, the Debtor now voluntarily files for Chapter 11 bankruptcy relief.

## IV.    GOAL OF CHAPTER 11 CASE

42.    The Debtor filed this Chapter 11 Case in order to provide it a method of controlling the costs associated with defending the Southstar lawsuit and prosecuting its insurance claims in the Coverage Litigation.  The Debtor intends to immediately remove the Southstar lawsuit and seek to transfer both that litigation and the Coverage Litigation to the Bankruptcy Court.  The Debtor believes that through the filing of the Chapter 11 Case, it can more cost-effectively defend itself from the underlying claims brought by Southstar and ultimately obtain the full protection of the insurance coverage to which it is entitled.

43.    As detailed below, the Debtor has negotiated a loan from POC Holdings 2, Inc., its managing member, for debtor in possession financing during this Chapter 11 Case in order to allow it to pay the costs of administering the case and prosecuting the litigation.  With this loan, the Debtor will be able to meet its bankruptcy and litigation costs without any impact on its ongoing projects or any negative effects on its customers, subcontractors or employees.  Prepetition, POC Holdings 2, Inc. had been lending the Debtor the funds needed to cover the costs of the litigation, but was unwilling to continue to do so without the protection provided to it and the Debtor from a chapter 11 filing and approved debtor in possession financing.

44.    While the Debtor disputes Southstar's claims and believes it will not be found responsible for damages in the amounts alleged by Southstar, a judgment against the Debtor by Southstar in an amount even close to the claimed amount would be far beyond the Debtor's ability to pay such judgment.  Of course, the Debtor believes that the insurance coverage it purchased will ultimately be available to pay most if not all of any such judgment if there were one.

45.    Now that this Chapter 11 Case has been filed, the Debtor will use this forum as venue from which to seek to liquidate Southstar's claims and obtain the full benefit of its insurance

coverage. The Debtor believes that the resolution of these claims through the Bankruptcy Court will allow it an opportunity to propose a plan that resolves these issues, allows it to reorganize its business and emerge from chapter 11 with its business intact and its ongoing construction projects unaffected by this process.

## V.     RELIEF SOUGHT IN THE DEBTOR'S FIRST DAY PLEADING

**A.     Debtor's Emergency Motion for Entry of an Order Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs ("Schedules Motion").**

46.     In the Schedules Motion, the Debtor seeks entry of an order extending the deadline by which the Debtor must file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statement of financial affairs (collectively, the "Schedules and Statements") by 21 days, for a total of 35 days from the Petition Date, through and including October 5, 2018.

47.     Prior to filing this case, the Debtor retained the firm of Stout Risius Ross, LLC ("Stout") as its financial advisor, and intends to file an application to authorize the continued retention of Stout as financial advisor in this case. To prepare the Schedules and Statements, I understand that the Debtor must compile information from books, records, and documents maintained by the Debtor relating to the claims of hundreds of creditors, as well as the Debtor's many assets and contracts, and provide them to Stout. Given the scope of the Debtor's operations, the Debtor and Stout will need substantial time to gather and process such information. In light of the size and complexity of the Debtor's business, and the resulting significant amount of work required to complete the Schedules and Statements, as well as the competing demands on the Debtor's employees and professionals to assist in critical efforts to stabilize the Debtor's business operations during the initial post-petition period, I believe an extension is necessary.

48.     I believe the requested extension will aid the Debtor in efficiently preparing accurate Schedules and Statements, as it will allow the Debtor and Stout to account for prepetition invoices not yet received or entered into its accounting system as of the Petition Date, and will minimize the possibility that any subsequent amendments to the Schedules and Statements are necessary. As such, I believe the extension will benefit not only the Debtor, but all creditors and other parties in interest. Although the Debtor, with the assistance of Stout and its other professional advisors, has begun to compile the information necessary for the Schedules and Statements, the Debtor has been consumed with a multitude of other legal, business, and administrative matters in the weeks prior to the Petition Date. Nevertheless, recognizing the importance of the Schedules and Statements in this Chapter 11 Case, the Debtor intends to complete the Schedules and Statements as quickly as possible under the circumstances.

**B.      Debtor's Emergency Motion for Entry of an Order Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records ("Cash Management Motion").**

49.     In the Cash Management Motion, the Debtor has requested an order (a) authorizing it to continue to maintain its existing bank Accounts and to continue to use its existing Business Forms; (b) authorizing, but not directing, continued use of its Cash Management System; and (c) granting the Debtor a waiver from certain of the United States Trustee's guidelines.

*i.      Debtor's Cash Management System and Accounts*

50.     The Debtor uses a cash management system (the "Cash Management System) in the ordinary course of its business which permits the efficient collection, transfer, and disbursement of funds generated by its operations. Prior to the commencement of this Chapter 11 Case, and in ordinary course of business, the Debtor maintained three (3) bank accounts (collectively, the "Accounts").

15

51.     As set forth in Exhibit A to the Cash Management Motion, the Debtor maintains a Collections Account (the "Collections Account") and a Disbursing Account (the "Disbursing Account") with JPMorgan Chase Bank, NA.  The Debtor also maintains a general payroll account (the "Payroll Account") with Wells Fargo Bank, NA.  The Debtor's existing Accounts function smoothly and permit the efficient collection, transfer, and disbursement of cash for the benefit of the Debtor and all parties in interest.  The Debtor's transition into chapter 11 will be significantly less disruptive if the Accounts are maintained following the commencement of the case with the same account numbers and, where applicable, automated relationship.  The Debtor further requests authority to deposit funds in and withdraw funds from all such accounts post-petition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, check, wire transfers, ACH, electronic funds transfers, and other debits, and to treat the Accounts for all purposes as debtor in possession accounts.

  ii.     *Debtor's Business Forms*

52.     In the ordinary course of business, the Debtor uses and maintains pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms (collectively, the "Business Forms").  Allowing the Debtor to continue to use its Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's "Debtor-in-Possession" status will significantly minimize the disruption to the Debtor's business.

  iii.     *Requested Waiver of Certain U.S. Trustee Guidelines*

53.     I understand that the Office of the U.S. Trustee for Region 7 (the "U.S. Trustee") has established guidelines (the "Guidelines") to supervise the administration of chapter 11 cases and prevent post-petition payments for prepetition claims.  The Guidelines require a chapter 11

16

debtor to, among other things: (i) close its existing books, records and bank accounts and open new post-petition books, records and bank accounts (which must bear debtor-in-possession labels, and must be opened at banks approved by the U.S. Trustee); (ii) establish separate bank accounts for operations, payment of taxes, cash collateral and payroll (to the extent the debtor had a separate payroll account prepetition); and (iii) obtain new checks bearing the designation "Debtor-in-Possession," along with additional information. Compliance with these requirements would create substantial and unnecessary administrative burdens. Requiring the Debtor to open new bank accounts and alter its Cash Management System would impose unnecessary expense, confusion, and diversion of scarce time and personnel, and would hinder the efficient use of the Debtor's resources during the critical first days of this case. On the other hand, permitting the Debtor to maintain its existing Accounts and Cash Management System (or to make only such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtor's operations and will not prejudice any party in interest.

54.    The Debtor has in place sophisticated, computerized record keeping systems and will be able to ensure that all prepetition and post-petition transactions are properly accounted for and can easily be distinguished. The Debtor will continue to maintain complete and accurate records of all transfers of funds in and out of the Accounts. Accordingly, I believe the relief requested by the Debtor in the Cash Management Motion is in the best interests of the Debtor, its estate, its creditors, and all parties in interest.

55.    In addition, consideration of the Cash Management Motion on an emergency basis will prevent immediate and irreparable harm to the Debtor's estate. The Debtor's payment cycle requires it to begin receiving funds in its existing Collection Account in the first two weeks of this case. Further, within three weeks of the Petition Date, the Debtor must begin forwarding payments

received to its subcontractors and vendors. My understanding is that new debtor in possession accounts cannot be set up and the existing payment mechanisms transferred to those new accounts in time to receive and then make the September payments. If the Debtor does not have accounts in place to receive the funds and disburse the quickly to its subcontractors, its projects risk significant delays and therefore the Debtor's business would face significant disruption and harm.

**C.**     **Debtor's Emergency Motion for Interim and Final Orders (A) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief ("Utilities Motion").**

56.     The Debtor has requested the entry of interim and final orders: (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service on account of prepetition invoices, (b) deeming Utility Providers adequately assured of future performance, and (c) establishing the Determination Procedures for determining adequate assurance of payment.

57.     Utility services are essential to the Debtor's ability to sustain its operations while this case is pending. To operate its business and manage its various job sites, the Debtor incurs utility expenses for electricity, water, telecommunications, internet, cable, and other similar services (collectively, the "Utility Services"). These services are provided by approximately ten (10) utility providers (the "Utility Providers"), with which the Debtor has accounts. A non-exhaustive list identifying the Utility Providers is attached as Exhibit A to the Utilities Motion. The Debtor spends approximately $9,000 per month for Utility Services at its principal place of business, as well as its various job sites.

58.     In general, the Debtor has established satisfactory payment histories with the Utility Providers and has made payments on a regular and timely basis. I am unaware of any material defaults or arrearages with respect to undisputed invoices for prepetition Utility Service as of the Petition Date. The Debtor intends to pay post-petition obligations for the Utility Services in a

timely fashion and in the ordinary course of business. I expect that revenue generated from business operations and/or funds from cash collateral and the proposed debtor in possession financing will be sufficient to pay all undisputed post-petition utility obligations. In addition, the Debtor has significant incentives to stay current on its Utility Service obligations as they come due because it relies heavily on the Utility Services in order to operate its job sites.

59.    The Debtor proposes to fund the Adequate Assurance Account with $9,000, an amount approximately equal to the Debtor's average monthly usage. The Adequate Assurance Account, together with the Debtor's ability to pay for future Utility Services in the ordinary course of business, provides more than adequate assurance of future payment to the Utility Providers.

60.    Continued and uninterrupted Utility Services are vital to the Debtor's ability to sustain its operations and complete ongoing projects during this case. Because of the nature of the Debtor's operations, termination or interruption of the Debtor's Utility Services would dramatically impair the Debtor's ability to conduct business and would cause considerable inconvenience to the Debtor's customers and employees. If Utility Providers are permitted to terminate or disrupt service to the Debtor, the Debtor's primary revenue source would be threated. As a result, I believe the procedures for adequate assurance of payment proposed by the Debtor in the Utilities Motion, as well as the proposed Determination Procedures, are fair and equitable, and in the best interests of the Debtor, its estate, its creditors, the Utility Providers, and other parties in interest.

**D.    Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Secured Financing, (II) Authorizing Postpetition Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Lender, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief ("DIP Motion").**

61.    In the DIP Motion, the Debtor has requested entry of order authorizing the Debtor to (a) obtain post-petition financing, (b) grant senior liens and superpriority administrative expense

status, (c) use cash collateral of prepetition secured parties, and (d) grant adequate protection to the prepetition secured lender.

62.    In order to finance the Debtor's ongoing prepetition expenses related to the Southstar claims and the related litigation with the Insurance Carriers, beginning on September 18, 2017, the Debtor borrowed funds from POC Holdings 2, Inc. (the "Prepetition Lender"). In total, the Prepetition Secured Lender has advanced $3,630,645.86 to the Debtor (the "Prepetition Secured Debt"). The Prepetition Secured Debt is evidenced by a Promissory Note in the maximum principal amount of $5 million and a Security Agreement granting the Prepetition Secured Lender a lien on all of the Debtor's personal property and proceeds in such property, both dated August 21, 2018 (the "Prepetition Loan Documents"). True and correct copies of the Prepetition Loan Documents are attached to the DIP Motion as Exhibit B.

63.    As of the Petition Date, the Debtor and POC Holdings 2, Inc. reached an agreement to enter into a Debtor-In-Possession Secured Promissory Note in the amount of $2,000,000.00 (the "DIP Loan"). The DIP Loan is necessary to preserve the value of the Debtor's estate. While the Debtor continues to earn sufficient cash-flow from its active construction projects to pay its ordinary debtors as they come due, the Debtor lacks sufficient cash reserves to continue financing the ongoing litigation over construction defects at the Celebration Apartments without further advances from the Prepetition Lender. Thus, in order to allow the Debtor to provide continued uninterrupted service on its projects, ensure that its vendors and employees are paid without interruption, continue to fully defend itself on the claims asserted by Southstar, and to pursue its rights under its various commercial general liability insurance policies, the DIP Loan is required.

64.    Given its current condition, financing arrangements and capital structure, the Debtor is unable to obtain an unsecured post-petition loan. Indeed, the Debtor and its advisors

20

have found that new credit is unavailable to the Debtor without providing superpriority claims and liens in the collateral. As such, it is my business judgment that the proposed DIP Loan provides a greater amount of financing on more favorable terms than any other reasonably available alternative.

65.     The Prepetition Lender has consented to the financing arrangements and the Debtor's continued use of cash collateral in accordance with the proposed budget attached as Exhibit C to the DIP Motion.   The consent of the Prepetition Lender is expressly limited to the financing being provided under the DIP Loan and would not extend to any other post-petition financing. Without authority to use Cash Collateral, the Debtor will not be able to function as a going concern and will not be able to proceed to consideration of a plan of reorganization. Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtor's business, and will be in the best interests of the Debtor, its estate and its creditors.

66.     Based on the foregoing, I believe authorizing the Debtor to enter into the DIP Loan and continue using the Prepetition Lender's cash collateral is in the best interests of the Debtor, its estate, its creditors, and all parties in interest.

**E.      Debtor's Emergency Motion Regarding Funds Held in Trust for the Benefit of Subcontractors and Other Vendors ("Vendor Motion")**

67.     In the Vendor Motion, the Debtor requests entry of an order providing that (i) construction payments received by the Debtor are held in trust pursuant to applicable state law and the Debtor lacks an interest in such trust finds; (ii) payments to the beneficiaries of such trust are not transfers of property of the estate to the extent that such payments are made solely from funds held in trust; and (iii) the Debtor is not prohibited from remitting such trust funds to trust beneficiaries on account of claims arising prepetition.

68.     In order to conduct its post-petition business, the Debtor needs to be able to issue payments to subcontractors, vendors, service providers, and employees, among others, without undue delay or administrative expense. The failure to make such payments would irreparably damage the Debtor's relationship with its owner clients and subcontractors/vendors. State law and the Debtor's contracts with its customers on each project require the Debtor to use funds received from its customers on account of subcontractor invoices solely to pay subcontractors/vendors providing labor and materials at the Debtor's construction projects. Thus, it is imperative that the Debtor timely remit those payments.

69.     It is my understanding that the construction payments received by the Debtor are held for the benefit of, and in trust for, its subcontractors, and that such funds are not property of the estate. Accordingly, the Debtor should be permitted to make payments in accordance with applicable state law and its project agreements.

70.     The Debtor has also requested authority to make these payments pursuant to the doctrine of necessity in order to preserve the going-concern value of the Debtor. In light of the severe damage to the relationships with its project owners, subcontractors, and vendors that would result from the Debtor's failure to timely make payments, the Debtor's ability to pay its trade creditors is critical to preserving the value of the Debtor's estate. As a result, I believe the relief requested in the Vendor Motion is in the best interest of the Debtor, its estate, its creditors, and other parties in interest.

Case 18-34892 Document 2 Filed in TXSB on 09/04/18 Page 45 of 47

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing Declaration of Todd Hagood in Support of Chapter 11 Petition and First Day Pleadings is true and correct to the best of my knowledge and belief.

Dated: September 4, 2018

By: Todd Hagood
Title: Vice President, Construction



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

ENTERED
09/06/2018

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **URBAN OAKS BUILDERS LLC,** | § | **Case No. 18-34892** |
| | § | |
| **Debtor.** | § | **Chapter 11** |



## ORDER REGARDING FUNDS HELD IN TRUST FOR THE BENEFIT OF SUBCONTRACTORS AND OTHER VENDORS
### (Relates to Doc. No. ___)

The Court considered the Emergency Motion for Entry of an Order Regarding Funds Held in Trust for the Benefit of Subcontractors and Other Vendors (the "Motion"),[1] filed by Urban Oaks Builders LLC, the above-captioned debtor and debtor in possession (the "Debtor"). The Court having reviewed the Motion and any objections thereto; and based on the First Day Declaration of Todd Hagood and the matters reflected in the record of the hearing held on the Motion; it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; that this is a core proceeding pursuant to 28 U.S.C. § 157; that notice of the Motion was sufficient; and it appearing that the relief requested is in the best interests of the Debtor, its estate, creditors, and other parties in interest, and that good cause has been shown therefore, finds that the Motion should be granted.

**IT IS HEREBY ORDERED THAT:**

1.      The Debtor is authorized and ordered to administer payments received from project owners as if such payments were held in trust for the benefit of the Debtor's subcontractors and vendors in accordance with applicable state law.

2.      The Debtor is hereby authorized to remit payment and make disbursements to its trust beneficiaries in accordance with applicable state law for invoices submitted to the Debtor,

---

[1] All terms not defined herein shall have the same meaning ascribed to them in the Motion.

regardless of when (prepetition or post-petition) such invoiced labor/materials were provided.

3. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: September 06, 2018

_____
Marvin Isgur
United States Bankruptcy Judge

SUBMITTED BY:

**OKIN ADAMS LLP**

By:  /s/ *Matthew S. Okin*
  Matthew S. Okin
  Texas Bar No. 00784695
  mokin@okinadams.com
  David L. Curry, Jr.
  Texas Bar No. 24065107
  dcurry@okinadams.com
  Ryan A. O'Connor
  Texas Bar No. 24098190
  roconnor@okinadams.com
  1113 Vine St., Suite 240
  Houston, Texas 77002
  Tel: 713.228.4100
  Fax: 888.865.2118

**PROPOSED ATTORNEYS FOR THE
DEBTOR**